UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT

OF TEXAS HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | & | Case No. 15-31594 |
| David Gordon Wallace Jr. | & | |
| Debtors. | & | Chapter 7 |
| Wayne M. English, and | & | |
| James D. Colling | & | |
| Plaintiffs, | & | ADV. NO. 15-03209 |
| v. | & | |
| David Gordon Wallace Jr. | & | |
| Defendant. | & | |

### PLAINTIFFS FIRST AMENDED ORIGINAL COMPLAINT TO DISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C. # 523

TO THE HONORABLE JEFF BOHM, UNITED STATES BANKRUPTCY JUDGE

COMES now Plaintiffs Wayne M. English ("ENGLISH") and James D. Colling ("COLLING") (collectively the "Plaintiffs") and files the Plaintiffs First Amended Original Complaint to Dischargeability of Debt Pursuant to 11 U. S. C. # 523 (the "Amended Complaint") and would respectfully show the Court the following:

#### JURISDICTION AND VENUE

1. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. & 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. & 157(b)(2).
2. Venue is proper in this Court pursuant to 28 U.S.C. & 1408.

#### PARTIES

3. English and Colling are creditors and party-in-interest in the above-referenced bankruptcy.
4. David Gordon Wallace ("Wallace") is an individual debtor in the above-referenced bankruptcy case and may be served with process on Wallace's attorney of record, Janet S. Casciato-Northrup at 333 Clay Street, Suite 2835, Houston, TX 77002.

## PLAINTIFFS' BACKGROUND

5. English in late 2007 and Colling in December 2007 invested $100,000 dollars each in the Wallace Bajjali Fund. Both English and Colling are hard working individuals with an eye towards retirement. None of the plaintiffs are sophisticated investors and relied on other professionals and advisors for their investment needs. At the time of their subsequent investment in Wallace Bajjali Fund and association with BizRadio, the Plaintiffs were looking for conservative and short term investments for growth and income.

## WALLACE'S BACKGROUND

6. At the time of the solicitation of the Plaintiffs to invest in the Wallace Bajjali Fund, Wallace presented declarations that he was a successful real estate developer, with unquestionable integrity with no "black marks" within his business activities or real estate endeavors.
7. In actuality, Wallace, had been involved in either directly or indirectly with multiple bankruptcies, lawsuits, foreclosures, and defaults prior to December 2007. None of his earlier projects were completed to a profitable conclusion for his investors; however, Wallace had reaped the rewards through his management fees, commissions, and ownership of his development partnership.
8. In this above-entitled bankruptcy, Wallace has admitted to collecting over half a million dollars in income for years 2013 and 2014. In addition, Wallace, at the creditors meeting on May 5, 2015, under questioning by Costa Bajjali, admitted he had received compensation in 2014 of over one million dollars.
9. The Wallace Bajjali Fund has been in existence since 2006, and no investor of the Fund has received any distribution, repayment, or return of equity of any kind.
10. Currently through his management of the Wallace Bajjali Fund, Wallace is directly involved in over 25 personal, business, or partnership bankruptcies and over approximately 10 personal, business, or partnership lawsuits.
11. Additionally, Wallace has been sued and fine by the SEC, and sued by the SEC receiver. At this time Wallace has only paid the $60,000 dollar fine levied by the SEC. Wallace has made no payment of any amount on any of his numerous personal guarantees. For each personal guarantee that Wallace executed, he was paid a 1% fee by the Wallace Bajjali Fund.

## BIZRADIO'S BACKGROUND

12. Daniel Frishberg ("Frishberg"), Daniel Frishberg Financial Services, Inc. d/b/a DFFS Capital Management, Inc., ("DFFS") and Albert Kaleta ("Kaleta"), Kaleta Capital Management ("KCM"), were registered investment advisors and they collectively owned and controlled Business Radio Network, L.P., d/b/a BizRadio ("BizRadio"). BizRadio was the recipient of loans from the Wallace Bajjali Fund in violation of the partnership agreement. English and Colling were clients of Daniel Frishberg.

13. Both Kaleta and Frishberg for their involvement and actions in the transfer of funds from Wallace and others were sued and fine by the SEC and sued by the SEC receiver. Kaleta filed bankruptcy in 2012 under case number 12-30558, Southern District of Texas.

## STATEMENT OF FACTS

**Plaintiffs Investment**

14. In late 2006, Wallace along with Costa Bajjali ("Bajjali"), formed the Wallace Bajjali Investment Fund II, L.P. ("WB Fund "), for real estate acquisition, investment, development, and profit. Pursuant to the formation of the WB Fund, Wallace, in late 2007, solicited the Plaintiffs to invest in the partnership. Wallace represented various facts and projects to the Plaintiffs including inter alia, (1) that the WB Fund was to last five years, (2) the project in Waco for student housing and retail development was to be completed by 2009, (3) that Wallace was an astute, honest, and an impeccable business man with experience in real estate development with no blemishes on his record, (4) that the WB Fund would limit the fund's investment in any one business or project to no more 33% of the money raised, (5) the funds raised would be used for real estate development in a conservative and low risk manner, and (6) that all transactions would be transparent and any issues with any project or development would be disclosed. Additionally, Wallace declared he had several previously completed and successfully managed real estate projects. In late 2007 based on these statements and in reliance on these representations English and Colling invested $100,000 dollars each in the WB Fund. All of these presentations by Wallace to convince the Plaintiffs to invest in Wallace's partnership were false, Wallace knew all the statements were false when they were made, and the Plaintiffs relied on the information to their detriment.

**Five Year Investment**

15. WB Fund was operational until filing bankruptcy in March 2015. Plaintiffs were refused the opportunity to disgorge themselves from the partnership after 5 years as stated by Wallace in his solicitation of English and Colling. The Plaintiffs would not have invested in the Fund if a longer timeline was presented prior to their investment.

**The Waco Project**

16. The Waco student housing and retail developments are not completed, several of the projects have been lost to bankruptcy, and the City of Waco has terminated Wallace's right to any further development. Additionally, Wallace failed to disclose, inform or explain to the Plaintiffs the following lawsuits and bankruptcy proceedings concerning the Waco projects: SWB Waco SH, L.P. and David G. Wallace, Chapter 11, 10-38001; Waco Town Square Partners, L.P. et al v. Guerino et al, 11-03655; Waco Town Square Partners L.P. and

Waco Town Square Partners II, L.P., 11-38928; and Waco Town Square Partners, L.P. et al v. NSJS Limited Partnership, 12-03144.

17. Wallace failed to keep the Plaintiffs timely informed of the following Waco projects disputes, bankruptcies and lawsuits. Waco's River Square Center, which Wallace purchased in 2007, has been in Chapter 11 bankruptcy since 2013 after defaulting on a loan. The Heritage Quarters project in Waco entered bankruptcy in 2011 and was seized by the lender in a foreclosure sale. The Austin Avenue Flats ran aground when Wallace Bajjali's chosen sub-developer, Michael Wray, racked up millions of dollars of cost overruns. Wallace, in July 2009, agreed to take on the project's debt and pay over 2 million dollars of partnership funds to cover the various construction liens filed on the property. A lawsuit concerning an issue with delinquent property taxes on the Waco Heritage Square project was filed in 2009.

18. Plaintiffs were not properly informed of the issues, defaults and delays with the Waco Projects. Wallace had a fiduciary duty to keep Plaintiffs apprised of all significant problems with any development that jeopardized company assets.

**Wallace's Business and Development History**

19. Wallace failed to disclose to the Plaintiffs the following bankruptcies that he was directly involved in prior to December 2007: In re Consolidated Power Battery Corporation, 00-37735, S.D. Tx Bankruptcy (Wallace was a minority owner)(company de-listed from stock exchange, assets liquidated); In re Ameristar Aircraft Sales and Services, 94-45359, S.D. Tx Bankruptcy (Wallace was a minority owner)(company liquidated); In re Ameristar Fuel Card Inc. 94-45133, S.D. Tx Bankruptcy (Wallace was a minority owner)(company liquidated); In re Emergency Networks Inc., 92-38179, N.D. Tx Bankruptcy (Wallace was investor, director, minority owner)(company liquidated, assets sold); and Waldron v Azure, 00-03616, S.D. Tx Bankruptcy, (This was suit to recover money/property. This was brought as an ancillary proceeding to In re Consolidated Power Battery Corporation. Wallace was a defendant.)(the directors & officers liability insurance resolved the case.).

20. Had Plaintiffs been made aware of these bankruptcy cases against Wallace in 2007, neither English nor Colling would have invested in the WB Fund.

21. Wallace failed to disclose to the Plaintiffs the following lawsuits involving his abilities to run and manage a business: Wallace v Thatcher. 199533796, 165th Court, Houston, Texas, Filed 7/12/1995 (Wallace sought TRO against Mr. Thatcher. The TRO prevented Thatcher from settling Laughlin v Wallace, which was related to Mr. Wallace's involvement with the Ameristar companies); Laughlin v Wallace, 94-004151, 61st District Court, Houston, (The suit related to Mr. Wallace's participation in the acquisition and management of the Ameristar companies. Mr. Laughlin brought claims for common law and statutory fraud, breach of fiduciary duty, improper withholding of money and profits, breach of agreements, conversion and shareholder derivative actions. ) (Mr. Wallace reached a global settlement with Mr. Thatcher and Mr. Laughlin); Southwest Bank of Texas NA v Sweiter, 199508946, 133rd Court Houston, (This was a case on a note in which Wallace was a defendant. The note was secured by an aircraft in Ameristar Aircraft Sales and Service) (A deficiency existed

after sale of the aircraft. A settlement was reached concerning the deficiency.); South Trust Bank v Wallace, 773900, Harris County Court 1, (This was a suit for collection on a note. Wallace & Associates was the maker on the note and Mr. Wallace was a guarantor.) (Wallace executed an agreed final judgment for $81,179.06. It could not be determined that the note was paid.); and Stull v United States of America, 93-cv-02266-H, N.D. Tx Dallas, (This was a tax suit in which the trustee of Emergency Networks L.P. was a movant, and the United States was a counter claimant against Mr. Wallace and Mr. Thatcher. All of the directors were brought in to determine whether or not they were a "responsible party" for unpaid taxes.)

22. Wallace did not have any successfully completed real estate project prior to Plaintiffs' investment. All statements made by Wallace concerning his development history and integrity to English and Colling were false, Wallace knew they were false when made, and the statements were made to entice the investments by the Plaintiffs.

23. Had Plaintiffs been made aware of these lawsuits involving Wallace in 2007, neither English nor Colling would have invested in the WB Fund.

**Breach of Partnership Agreement**

24. From November 28, 2006 through December 31, 2007, Wallace offered and sold securities in a real-estate fund he controlled in Houston, Texas, called the Wallace Bajjali Investment Fund II, L.P.. Beginning in 2006, Wallace entered into an agreement with an investment adviser firm in Houston, Texas. The agreement allowed the adviser firm to recommend to its clients securities investments in the WB Fund, controlled by Wallace. The Plaintiffs are both investors in the WB Fund and clients of the investment adviser.

25. Wallace reviewed and approved a private-placement memorandum ("PPM") containing information for investors about the WB Fund securities offering. In the offering, Wallace distributed the PPM to the Plaintiffs personally and through the Investment Adviser. In the PPM's written disclosures relating to the securities offerings, Wallace represented to Plaintiffs that he would limit the Fund's investment in any one business or project to certain percentages of the money the Funds raised to no more than 33% for the WB Fund. By May 2007, the WB Fund had received offering proceeds of approximately $16 million and had invested more than $6.5 million of those proceeds in Business Radio Networks, L.P. d/b/a BizRadio ("BizRadio"), a struggling media company. As a result, more than 40% of the WB Fund's offering proceeds at the time were invested in BizRadio, far exceeding the PPM's 33% limit.

26. Contrary to his written representations, Wallace far exceeded the limits set by the PPM by heavily investing the Fund's money in BizRadio. As a result, Wallace subjected the Plaintiffs investment to substantially greater investment risk than the Fund's written materials disclosed. Had the Plaintiffs been made aware that the Fund was going to exceed and ignore partnership stated objectives and parameters, neither English nor Colling would have invested in the WB Fund.

27. Pursuant to Wallace and the investment advisor's actions in the transfer of funds and loans from the WB Fund to the BizRadio entities in violation of the partnership agreement, on November 13, 2009, the Securities and Exchange Commission commenced the enforcement action against the investment advisor and BizRadio. (See SECURITIES AND EXCHANGE COMMISSION v. ALBERT FASE KALETA AND KALETA CAPITAL MANAGEMENT, INC., DEFENDANTS, AND BUSINESSRADIO NETWORK, L.P. d/b/a BIZRADIO AND DANIEL FRISHBERG FINANCIAL SERVICES, INC. d/b/a/ DFFS CAPITAL MANAGEMENT, INC., RELIEF DEFENDANTS, SOLELY FOR THE PURPOSES OF EQUITABLE RELIEF, Civil Action No.4:09-cv-03674, in the United States District Court for the Southern District of Texas, Houston Division) (the "Enforcement Action").   On December 2, 2009 the district court appointed Thomas L. Taylor III ("Receiver"), as Receiver over all property, assets, and records of Kaleta Capital Management, and all entities owned or controlled by it.  Plaintiffs, as investors and limited partners of the WB Fund, are creditors of the receivership estate and would receive a percentage of any distribution of assets.
28. After investigating the actions of Wallace and the WB Fund in relation to the loans and promissory-note securities extended to BizRadio, on or about July 2010, the Receiver began negotiations with Wallace concerning the investments in BizRadio from the WB Fund.
29. On or about May 25, 2011, The Securities and Exchange Commission (the "Commission"), filed an enforcement action against Messrs Wallace and Bajjali, based on Wallace's transfer of partnership funds from the WB Fund to BizRadio in violation of the partnership agreement . (See SEC v. Wallace et al., No. 4:11-cv-01932, in the United States District Court for the Southern District of Texas, Houston Division.) ("Wallace SEC Action").  The district court in this action ultimately entered Agreed Final Judgments against Wallace and Bajjali individually, permanently enjoining each from future violations of Section 17(a) of the Securities Act of 1933 and imposing on each a civil penalty of $60,000.
30. After months of negotiation with the Receiver on September 12, 2011, Wallace executed a settlement and release concerning the money that was loaned to the BizRadio entities. Subsequently, the district court approved the compromise settlement and release agreement ("Settlement"), among the Receiver and the Wallace Bajjali parties, including Messrs., Wallace and Bajjali. The Settlement required three WBP entities, W. Houston Fund, LFW Fund and Spring Cypress to execute replacement promissory notes totaling approximately $879,176.35, reaffirming existing debts. Wallace and Bajjali guaranteed the full amount of each replacement note.  Additionally, Wallace and Bajjali issued and personally guaranteed a "Cash Flow Note" to the Receiver for an expected payment of $300,000 to $450,000 based on the "dedicated cash flow" from the WBP entities development project in Amarillo, Texas ("Amarillo Project").  Payments on the settlement, after the granting of an extension, were to be completed by December 31, 2014. Wallace is paid a 1% fee by the WB Fund for each note he makes a personal guarantee.
31. Plaintiffs, as creditors in the receivership estate, would be entitled to a distribution of funds that are recovered by the receiver pursuant to these replacement notes, the cash flow note, and the personal guarantees of Wallace.
32. The three WBP entities have made no payments on the executed promissory notes.

33. Wallace and one or more of the WBP entities received a six figure payment of approximately 924 thousand dollars from the Amarillo Project on or before February 2012. Subsequently the City of Amarillo terminated the Wallace Bajjalli developer agreement declaring the firm in default of its contract and severed all ties.
34. Wallace made no payments from the Amarillo Project on the "dedicated cash flow note".
35. Under filings in Wallace's Statement of Financial Affairs in this Honorable Court, Wallace disclosed that he received from January 2013 to present approximately $566,403.59 in salary, bonuses, dividends, settlement funds, and deferred compensation. {Main Case Docket No. 20, pg 127}
36. On May 5, 2015, during the meeting of creditors, Wallace admitted under oath that during calendar year 2014 from salary, commissions, conversions of loans, and others forms of borrowing and/or compensation, Wallace had received approximately $1,000,000 dollars. Additionally, Wallace admitted that he has never made any payments on any of the defaulted partnership loans in which he had personally guarantee.
37. Wallace failed to make any payments to the Receiver required under the Settlement agreement. After giving Wallace two letters of notice of default on January 5 and 14, 2015, the Receiver in late January filed a lawsuit alleging there had been a breach of the settlement agreement.   {Main Case Docket No. 20, pg. 107, 129}
38. Wallace acknowledge in his Statement of Financial Affairs in the above-reference bankruptcy the lawsuit filed by the Receiver, Thomas Taylor, cause no. 4:15-00272 and listed as the nature of the proceeding, Breach of Contract for "Promissory Notes and Guaranty Agreements". (Main Case Docket no. 20, pg. 129)   Additionally, Wallace listed the Taylor Law Offices as the attorney representing the receiver for Kaleta Capital Management, LP., and Thomas L. Taylor as an unsecured creditor for business debt that "Mr. Wallace personally guaranteed this debt".  {Main Case Docket No. 20, pg. 106 and 107, respectively}
39. None of the BizRadio notes have been re-paid to investors and the note holders including the Plaintiffs now hold claims against the Receivership Estate for these amounts.
40. Wallace knew or should have known that, by investing so much in BizRadio, the Wallace Bajjali Fund had exceeded the investment limits stated in the PPM. As a person in charge of the Fund, Wallace should have taken steps to ensure the Fund's invested are within the limits provided in the PPM. These limits signified a certain level of diversification, such that the Fund's risk of loss from any single investment would be minimized. Because the Fund exceeded the investment limits in BizRadio, Plaintiffs were forced to take on much greater investment risk that Wallace disclosed in the PPM.
41. Had Plaintiffs been made aware of such a large investment in one project and the increase risk of loss in 2007, neither English nor Colling would have invested in the WB Fund.

**WB Fund's Conservative Investment Philosophy and Accountability**

42. In late 2007 and throughout 2008 Wallace presented information to the Plaintiffs that the Wallace Bajjali projects were to encompass real estate investing in a conservative and low risk manner suitable for IRA's and individuals near retirement.  These statements by

Wallace were false when made and hindered Plaintiffs from ascertaining the deteriorating effect the projects and developments Wallace was engaged in had on their investments.

43. Prior to Wallace's bankruptcy filing, Plaintiffs did not have any financial records of the WB Fund or any of the records of any of the Wallace partnerships. From 2008 to the resignation of Wallace and Bajjali in January 2015, during the operation of the WB Fund, Wallace, Bajjali, and other partnership employees have refused repeated request for company financials. Specifically, at partnership meetings on or about April 21, 2009 in Houston; April 28, 2009 in Dallas; June 29, 2010 in Houston and Dallas; late September 2010 in Houston and Dallas; January 14, 2014 online; and June 26, 2014 in Houston (collectively the "partnership meetings"); the Plaintiffs have requested documents and reports.

44. From 2009 through 2014, both English and Colling made repeated attempts by going to company offices in Dallas, Texas, with BizRadio and in the company offices in Houston, Texas, to get documents and explanations on the company financials, operation and projects. At no time did Wallace or any employee, officer or director of the WB Fund, and/or BizRadio proffer any financials. This lack of transparency was in contradiction to Wallace's statements and remarks in 2007 prior to the Plaintiffs making investments in the WB Fund.

45. Wallace failed to make, in person or at any of the partnership meetings, any material disclosures concerning the status, operation and financial condition of the sixty-seven individual Wallace Bajjali partnerships. Wallace purposely withheld material facts concerning the income, expenses, compensation, assets, liabilities, and the terms of any joint development agreements, to hinder and conceal the deteriorating condition of the Plaintiffs investments. Had the Plaintiffs been informed of the true condition of the partnerships and their respective projects, English and Colling could have instituted a course of action to salvage their investment. At the partnership meetings Wallace was presenting facts to the Plaintiffs that overstated the appraised value of partnership property and withheld the identification of ancillary loans, notes payable and expenses that were misleading about the financial condition of the projects and associated partnerships.

46. In March 2015, twenty of the partnerships filed for bankruptcy. (All of the partnerships bankruptcies are consolidated under 15-31305 S.D. of Texas, Houston District). Pursuant to the documents and schedules filed in the twenty bankruptcy filings, seventeen of the partnerships had no income, no assets, and no real estate listed since 2013.

47. Prior to this bankruptcy filing, Wallace was concealing the financial condition of the partnerships to the Plaintiffs. Specifically, at the online partnership meeting on or about January 20, 2014, Wallace presented an investor capitalization showing the Partnerships had a net worth of $10,959,777 dollars. After filing bankruptcy, collectively the twenty partnerships have a net worth of less than two million dollars. The Porter partnership had a Wallace" appraised" value of over eight million dollars. Investigations of the schedules and real estate holdings have determine the value to be less than one million dollars. Finally at the January 2015 meeting Wallace had provided that the losses concerning the BizRadio investment was $11,723,382. The actual investment in BizRadio was $2,436,577 from WB fund and $3,692,417 from the LFW Economic Opportunity Fund, LP.

48. Had Wallace expressed there would be no transparency or accountability to the Plaintiffs concerning their investments, neither English nor Colling would have invested in the WB Fund.

**Wallace's Development History**

49. Prior to forming the Wallace Bajjali Fund, Wallace had not acquired, developed and successfully completed any real estate projects.
50. Although for distress company acquisitions, Wallace working relationship with Mark Thatcher from 1992 to 2000, resulted in four bankruptcies and one lawsuit between Wallace and Thatcher. (See paragraph 19 and 21, Consolidated Power Battery, Ameristar Aircraft, Ameristar Fuel Card, Stull v United States of America, and Wallace v Thatcher)
51. Wallace working relationship with Will Perry ("Perry") and the W.C. Perry Property Realty Fund LP,("Perry Properties") , from 2005 to 2008, resulted in various allegations of fraud, larceny, embezzlement, and fraud as a fiduciary between Wallace and Perry. This resulted in several lawsuits and bankruptcy filings including but not limited to Flagship Mezzanine Funding v Perry, 200742435, 215th Court, Houston; In re Will Perry, 08-32362, S.D.T.X. Bankruptcy; Perry v Wallace, 08-03465, S.D.T.X. Bankruptcy; and Wallace v Perry, 09-03299, S.D.T.X. Bankruptcy.
52. Wallace along with Bajjali, without informing the Plaintiffs, transferred $ 3,780,315 dollars from the WB Fund to pay the debts of Perry Properties that included loans on the Morton, Cypress, Creekmont and Flagship projects. Perry Properties was in disarray, a complete failure and nearing foreclosure. These loans were not the obligation of the Fund and Wallace failed to disclose to the Plaintiffs the situation resulting in the WB Funds investment in the Perry projects. Wallace paid the loans so he and Bajjali could savage their investment and ownership in Perry Properties without enacting their fiduciary duty to the partnership and the Plaintiffs. Both Morton and Creekmont filed bankruptcy in March 2015 with no income, no assets, and no real estate holdings. Additionally the Creekmont bankruptcy has listed a loan obligation of $819,813.06 to Frost National Bank. Plaintiffs could not identify what project the flagship loans originated from and cannot determine the status of the Cypress project, however, neither the Plaintiffs nor any of the WB Fund's partners has received any distribution from any of the Perry Properties projects.
53. Had Wallace disclosed to the Plaintiffs his past failures in real estate development when English and Colling made inquiries in 2007, neither English nor Colling would have invested in the WB Fund.
54. Since the beginning of the WB Fund partnership, during the last 9 years, Wallace has not managed any real estate project from acquisition, planning, and development, to completion and distribution of profits and/or equity to Plaintiffs.
55. From 2006 to the present, through the WB Fund partnership, Wallace propagated a litany of bankruptcies, defaults, foreclosures, lawsuits, and abandonment of real estate developments in a manner that hid the loss of the Plaintiffs investments. By incorporating over sixty-seven partnerships and failing to provide Plaintiffs with any financial records,

documents, or business disclosures, Wallace could conceal his fraudulent scheme to transfer most of the Plaintiffs investments for his own use. At no time during the last nine years did the Wallace Bajjali Fund distribute any compensation to the Plaintiffs or generate any profits.

56. Wallace did not disclose to the Plaintiffs any of the following lawsuit: Ronald Ellisor, et.at. (investor litigation-Harris C.); Frost National Bank (breach of contract and personal guarantee-Harris C.); Thomas L. Taylor, Receiver (breach of contract, guaranty agreements-U.S. District ct Houston); Charles Clements (Breach of Contract-Travis C.); Christine Bryant (Breach of Contract, Fraud-Jasper C.); Bruce Anderson (Breach of Contract-Jasper C.),; TR Dunn Family Trust (Fraud and Breach of Contract); Plains State Bank (Breach of Contract, Personal Guarantee-Ft Bend C.); W. C. Perry Properties (Fraud, breach of Contract, Breach of Fiduciary Duty-Ft. Bend C.); One Sugar Lake Professional Center Partners (Breach of Contract, Personal Guarantee-Ft Bend C.); Ethelyn Taylor, Robert Taylor, deceased (Fraud-Ft Bend C.) ; James Bonnett (Breach of Contract-McLennan C.); and Lowery Bank(Breach of Contract, Personal Guarantee-Ft Bend C.).

57. Wallace did not disclose to the Plaintiffs the filing of the SEC lawsuit, the $ 60,000 dollar SEC fine levied on Wallace, the filing of the SEC receiver lawsuit, and the settlement with the receiver for 1.5 million dollars. Additionally, Wallace withheld the fact that he defaulted on the settlement with the receiver.

58. Wallace did not disclose to the Plaintiffs the SEC filings and fines levied on Kaleta, Frishberg, and BizRadio, in which the WB Fund had a significant investment.

59. Wallace did not disclose to the Plaintiffs the serious and deteriorating financial condition of the following partnerships: Porter Development Partners, WB Murphy Road Development, Creekmont Plaza Partners LP, Creekmont Plaza Partners GP, Replacement Sanctuary Gp, WB Sanctuary GP, WB Chancel GP, WB 2610 LLC, Meadow Crest Developers GP, Morton & Porter LP, Morton & Porter GP, Riata West Investment LLC, Lakecrest Village Investments LLC, WM Real Estate Holdings LLC, US Public-Private Real Estate Fund I LP, Wallace Bajjali Investment Fund II LP, West Houston WB Realty Fund LP, WBIF GP LLC, WS Substitute GP LLC, and PPP Management LLC. All of these partnerships filed bankruptcy in March 2015. (all cases consolidated under U.S. Bankruptcy Court , Southern District of Texas, No. 15-31305).

60. Wallace did not disclose to Plaintiffs that Wallace Bajjali's SWB Waco River Square was in Chapter 11 bankruptcy since 2013 after defaulting on a bank loan; and that the WBP Heritage Quarters student housing complex was seized in a foreclosure sale in spring 2014.

61. Wallace did not disclose to Plaintiffs that the City of Waco in 2014 terminated Wallace Bajjali as master developer after the WBP entities failed to develop the remainder of the blocks in front of City Hall.

62. Wallace did not disclose that the City of Joplin fired Wallace Bajjali as master developer and accused the firm of "gross negligence, fraud and willful misconduct".

63. Wallace made representations that he knew were false at the time they were made. He made the statements to deceive the Plaintiffs and both English and Colling relied on the statements in investing in the Wallace Bajjali Fund. As a result of Wallace's declarations and

in reliance thereof, Plaintiffs have each lost their $100,000 dollar investment. Had the Plaintiffs been properly informed they would have not invested in the WB Fund with a general partner of Wallace's history, pattern of disputes and multiple bankruptcies. As General Partner, his fiduciary duty was with the Plaintiffs and their investments.

**Wallace Bajjali Development Partners, L.P. and WB Realty Group, L.L.C.**

64. The Wallace Bajjali Development Partners, L.P., ("WBD Partners") is the developmental arm of the Wallace Partnerships. This entity has employees who perform development services, accounting, investor relations and other services. Wallace is the Chief Executive Officer. It is a limited partnership that is owned 50% by Bajjali and 50% by the two trusts of Wallace's children. WB Realty Group, L.L.C. ("WB Realty"), is the real estate partnership of Wallace and Bajjali that facilitates, for fees and commissions, the acquisition and disposal of Wallace's development projects and tenant leases.
65. Neither Wallace Bajjali Development Partners, L.P., nor WB Realty Group, L.L.C. has filed bankruptcy at this time. Currently, Plaintiffs have a limited amount of company records.
66. The fees and commission charged to the WB Fund and other Wallace partnerships by WBD Partners exceed $600,000 yearly. The compensation included asset management fees, construction management fees, development fees, and management and accounting fees. In addition, Wallace and Bajjali were paid a 1% fee for their personal guarantees on any loans. WB Realty, acting as the real estate agent for the property transactions, would charge a 6% commission whether the project was being acquired or liquidated. For securing any lease agreements, WB Realty was paid a 1.5% commission.
67. Although Wallace has received a substantial income from the 1% commission, Plaintiffs have not identified any personal guarantees where, after default on the loan, Wallace fulfilled his contractual obligation. This resulted in a substantial financial gain for Wallace. Wallace at the time of executing the personal guarantees had no intention to honor any of them. Rather, Wallace propagated a scheme to increase the number of development projects, and thereby, increase the fees, commissions and salary he was receiving. The Plaintiffs have received no benefit or distribution of any transaction.
68. For calendar year 2009, WBD Partners charged WB Fund and its subsidiaries approximately $37,459 in asset management fees, $18,270 in construction management fees, $201,900 in development fees, and $398,900 in management and accounting fees. In May 2009, the WB Fund paid a 1.5% commission to WB Realty for securing a 12,150 square-foot tenant lease. In mid 2009, the WB Fund paid a 6% commission to WB Realty for the purchase of approximately 21 acres of land at the intersection of Hampton and Murphy Roads in Missouri City, Texas. The purchaser was the Wallace partnership of WB Murphy Road Development, LLC .. Several years later, one large parcel was sold off to WB-OM AL Development I LLC. , another Wallace partnership. After selling two other parcels, to a Medical Facility and a residential developer, WB Murphy Road Development, LLC., filed bankruptcy in March 2015. Wallace received fees and commission on the transactions, and

still is an owner of WB-OM AL Development LLC., which has not filed for bankruptcy. The Plaintiffs and the WB Fund received no benefits or distribution.

69. Although Wallace had not generated any profit, completed any project or distributed any funds to the Plaintiffs, the WB Funds and their subsidiaries were charged development fees that exceeded $780,000 for 2009.

70. Consistently throughout the operation of the Wallace partnerships, Wallace would sell off substandard and deteriorating equity assets from the WBD Partners to the WB Fund. The WB Fund would provide funds in return for the equity interest. Plaintiffs have not identified any transaction of equity interest that was profitable to the WB Fund. All transactions resulted in default, foreclosure or bankruptcy for the WB Fund, a loss of the Plaintiffs investment, and a substantial financial gain for Wallace.

71. WB Realty would charge the WB Fund and its subsidiaries a 6% commission on the purchase of real estate. Generally in Texas, most, if not all real estate transactions are only paid by the seller. Wallace never disclosed to the Plaintiffs the additional real estate commission when property was purchased. If Wallace had informed the Plaintiffs prior to their investment, neither English nor Colling would have invested in the partnership. Had Wallace disclosed to the Plaintiffs during the operation of the WB fund that additional real estate commissions were being charged, both English and Colling would have instituted complaints and/or legal action. This practice basically amounted to "double dipping" as the commissions were paid by both the seller and the WB Fund. Over the course of the last nine years, this conduct would have negated approximately four million dollars in liability to the partnership bottom line and generated a substantial financial gain for Wallace. As a controlling party in the WB Realty and the WB Fund, Wallace as the fiduciary should have never allowed nor condone such an activity. Wallace clearly benefitted while the Plaintiffs investment suffered.

72. Wallace, as general partner and CEO of WBD Partners had a fiduciary duty to work for the interest of the limited partners and the Plaintiffs he solicited. Instead, Wallace systemically generated commissions, fees and compensation to the Wallace Bajjali Development Partnership. Wallace and WBD Partners were able to collect the fees and commission whether or not the project was successful, the loans were in default, he honored the personal guarantees, or the deal was abandon. The Plaintiffs relied on Wallace's statements and his contractual and fiduciary obligations to their detriment and loss of their investment.

73. Wallace filed a voluntary petition for relief under Chapter 7 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") on March 24, 2015 (the "Petition Date") thereby commencing the present proceeding. All legal action involving Wallace is currently subject to the automatic stay arising from Wallace's filing to the voluntary petition.

<u>CAUSES OF ACTION</u>

74. Under the Bankruptcy Code, not every debtor is afforded a fresh start—only the honest and unfortunate debtor. Grogan v. Garner, 498 U.S. 279, 287, (1991). The Bankruptcy Code excepts certain debts from discharge in section 523(a) of the Bankruptcy Code.

### A. Exception to Discharge Under Bankruptcy Code Section 523(a)(2)(A) for Debts Obtained by False Pretenses, False Representations and/or Actual Fraud

75. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 73 hereinabove.
76. Section 523 (a)(2)(A) of the Bankruptcy Code creates a rule of nondischargeability for any debt for the money to the extent it was obtained "by false pretenses, a false representation, or actual fraud." 11 U.S.C. & 523(a)(2)(A).
77. The purpose of excepting debts from discharge caused by false representations, false pretenses, or actual fraud is to prevent debtors from retaining the benefits of property obtained by fraudulent means and to ensure that the relief intended for honest debtors does not benefit dishonest debtors. Consequently, debts resulting from money or property that has been obtained by false pretenses, false representations or by means of actual fraud are not dischargeable. In re Cunningham, 163 B.R. 657, 660 (Bankr. D. Mass. 1994).
78. The funds raised by Wallace from the Plaintiffs were obtained by and through the fraudulent scheme of Wallace to provide statements he had no intention of honoring, written representations in the PPM's he would not follow, material facts he was not going to disclose and a fiduciary duty and obligation he intended to violate.
79. The representations recounted above were false when they were made, and the debtor knew they were false. Wallace made the above representations with the intent to deceive the Plaintiffs. Plaintiffs actually and justifiably relied on the representations. Plaintiffs sustained a loss as a proximate result of their reliance on the representations.
80. In soliciting the investment from English and Colling, Wallace made declarations that were of critical importance to Plaintiffs, including, but not limited to:
    a. The WB fund was to last 5 years;
    b. Wallace was an astute, impeccable, and successful developer;
    c. The Waco project was to completed by 2009;
    d. The WB Fund was going to limit any one investment to under 33%;
    e. The funds raised would be used in a conservative, low risk manner;
    f. The partnership activities were to be transparent.

81. Each of the above facts stated to Plaintiffs were material to Plaintiffs decision in making the investment in the WB Fund. If the above facts were not presented to Plaintiffs, they would have not invested in the WB Fund. Plaintiffs suffered damage as a result of Wallace's failure to honor his representations. Collectively, the Plaintiffs lost $100,000 each as a result of Wallace's frauds.
82. In soliciting the investment from English and Colling, and in the operation of the WB Fund, Wallace made misrepresentations of material facts and omitted material facts which he had a duty to disclose to Plaintiffs, including, but not limited to:
    a. Wallace did not have any previously successful real estate developments;
    b. Wallace had multiple lawsuits and bankruptcies in previous developments;

      c. The method, frequency, and percentage of compensation to Wallace Bajjali Development Partners, L.P.;
      d. The financial status or solvency of the partnerships;
      e. That a project or partnership was considering filing Bankruptcy;
      f. That Wallace had defaulted on personal guarantees;
      g. The filing of lawsuits and construction liens against Wallace and his projects;
      h. That the SEC had sued Wallace, Wallace was fined by the SEC and the SEC receiver lawsuit and settlement;
      i. That Wallace had defaulted on the SEC receiver settlement;
      j. That Wallace had not completed any project;
      k. That Wallace was not going to distribute any funds, or release financial records;
      l. That Wallace was going to breach his fiduciary duty to the partnership and Plaintiffs.

83. Defendant made misrepresentations of material facts and omitted material facts which he had a duty to disclose. The misrepresentations and omissions were made knowingly and intentionally with the intent that Plaintiffs rely on them in order to induce Plaintiffs to invest in the WB Fund, or alternatively, prevent Plaintiffs from taking action to prevent any further depreciation of their investment. Plaintiffs reasonably relied on Defendant and as a direct and proximate result of such reliance were damaged.

84. Accordingly, Plaintiff is entitled to have the indebtedness owed by Wallace exempted from Wallace's chapter 7 bankruptcy discharge.

### B. Breach of Fiduciary Duty and Defalcation

85. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 73 hereinabove.

86. Section 523(a)(4) of the Bankruptcy Code creates a rule of nondischargeability for any debt "for fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. & 523(a)(4).

87. Wallace was general partner in the WB Fund and a general partner, officer, executive, owner, trustee of the owner, or register agent of other Wallace Bajjali partnerships, and under Texas law was a fiduciary to these entities.

88. The Texas Supreme Court has held that partners owe fiduciary duties to one another. Johnson v. Brewer & Pritchad, P.C. 73 S.W.3d 193, 199 (Tex. 2002) (citing Bohatch v. Butler & Binion, 977 S.W. 2d 543, 545 (Tex. 1998)). Partners also owe a fiduciary duty to the partnership. See Frazier v. Havens, 102 S.W. 3d 406, 414 (Tex. App. –Houston{14$^{th}$ Dist.} 2003, no pet.). A fiduciary's duties encompass a duty of good faith and fair dealing and he must place the interests of the other party ahead of his own. Abetter Trucking Co. v. Arizpe, 113 S.W.3d 503, 508 (Tex.App-Houston{1$^{st}$ Dist.} 2003, no pet.) "Texas courts have long held that 'it is axiomatic that a managing partner in a general partnership owes his co-partners the highest fiduciary duty recognized in the law.'" McBeth v. Carpenter, 565 F.3d 171, 177(5th Cir. 2009)(quoting Crenshaw v. Swenson, 611 S.W.2d 886, 890 (Tex.Civ.App.-Austin 1980, writ ref'd n.r.e.)).

89. Plaintiffs entrusted funds with Wallace. Rather than make use of the funds as promised and agreed, Wallace used them for his own purposes.
90. Wallace occupied a position of trust as he was handling the Plaintiffs' funds and as he was the controlling person or the general partner of the WB Fund.
91. Wallace's misrepresentations and omissions constitute fraudulent conduct, or alternatively, defalcation by Wallace while acting in a fiduciary capacity.
92. In particular, as a fiduciary, Wallace had a heightened duty of disclosure, absolute honesty and an absolute prohibition against self dealing.
93. The misrepresentations and omissions by Wallace or Wallace's agents constituted fraud while acting in a fiduciary capacity and a breach of his fiduciary duty.
94. Plaintiffs have been damaged in the amount of $100,000 each as a direct and proximate result of Wallace's actions.
95. Accordingly, Plaintiffs are entitled to have the indebtedness owed by Wallace exempted from Wallace's chapter 7 bankruptcy discharge.

  C. **Exception to Discharge Under Bankruptcy Code Section 523(a)(6) for Debts for Willful and Malicious Injury by the Debtor to Another of Its Property**

96. Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 73 hereinabove.
97. Section 523(a)(6) of the Bankruptcy Code creates rule of nondischargeability for any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. &523(a)(6).
98. The Fifth Circuit has held that "an injury is willful and malicious where there is either an <u>objective substantial certainty</u> of harm or a <u>subjective motive</u> to cause harm." Shcolnik v. Rapid Settlements Ltd. (In re Shcolnik), 670 F.3d 624 (5th Cir. 2012) (citing In re Miller, 156 F. 3d 598, 606 (5th Cir. 1998); In re Williams, 337 F. 3d 504, 508-09 (5th Cir. 2003)) (emphasis added) (internal citations omitted).
99. Wallace occupied a position of trust in the management and care of the assets of the WB Fund as he was the general partner and controlling person.
100. In particular, as a fiduciary, Wallace had a heightened duty of disclosure, absolute honesty and an absolute prohibition against self dealing.
101. The fraudulent scheme perpetrated by Wallace included his capacity to exceed the 33% limit on investments in any one entity; to create a scheme to generate a stream of commissions at the expense of the Plaintiffs and their investments ; and Wallace's intentional failure to honor any of his personal guarantees. These actions created "an objective substantial certainty of harm" to the Plaintiffs and their investments. Wallace's conduct effectively stripped WB Fund of its assets as the projects went into default rendering the Plaintiffs investment worthless.
102. Wallace's scheme has demonstrated "a subjective motive to cause harm" to the Plaintiffs and their investment, because (1 the 40% investment in BizRadio exceeded the diversification requirements set forth in the Partnership agreement, and (2) Wallace's

purpose in signing the personal guarantees was to create an opportunity where the fund would receive more projects and thereby generate more commission and fees. Wallace knew he would benefit by receiving more compensation at the expense of the WB Fund, and the fund was not likely to receive any repayment of those expenditures.

103. Wallace is liable to Plaintiffs for the damages caused to the projects of the Wallace partnerships by his fraudulent scheme, his active participation of fraudulent transfers from the WBP Entities and any benefit conferred on him through his conduct.

104. Accordingly, Plaintiff is entitled to have the indebtedness owed by Wallace exempted from Wallace's chapter 7 bankruptcy discharge.

## CONCLUSION AND PRAYER

Plaintiff respectfully requests that the Court:

(a) Determine that Wallace's debt to Plaintiffs is not dischargeable pursuant to 11 U.S.C. &523;
(b) Award Plaintiff reasonable attorney's fees, expenses, and costs related to bringing this adversary proceeding;
(c) Award Plaintiffs their investment of $100,000 dollars each and pre-judgment interest and post-judgment interest, at the highest rate allowed by law;
(d) Award punitive damages, and special damages from the egregious conduct and the actions of the defendant to perpetrate a course of conduct to generate a stream of commissions against the investment of the Plaintiffs, and the premeditated intent to not pay any claim or make partial payment on any of his personal guarantees or settlements with the SEC Receiver although having the assets, the ability and the opportunity to do so.
(e) Grant Plaintiff such other and further relief, whether in law or in equity, to which he may be justly entitled.

Date: November 18, 2015

Respectfully submitted,
By: /s/ Wayne English
Wayne English, pro se
4849 Bluecap Court
Mesquite, Texas 75181
Tel: 214-460-4975 (Fax 972-222-4285)
Waynemenglish@aol.com


/s/ James Colling
James D. Colling
1105 Essex Ct.
Seabrook, Texas 77586
Tel: 281-309-1233
J.David.Colling@gmail.com

**CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of this pleading was served by U. S. Mail to Simon Mayer, Hughes Watters Askanase, LLP., 333 Clay Street, 29th Floor, Houston, Texas 77002-4168


_/s/ Wayne English_                                        _/s/James Colling_

Wayne English                                                James Colling